Our second case today is United States v. Naughton, Ms. Skelton. Good morning. May it please the Court. The core of the Fourth Amendment is to protect against government agents breaking into people's houses without a warrant. I'd like to start with talking about the two warrantless searches and then I'd like to address the fact that the jury convicted Mr. Naughton of 924C despite the absence of a predicate crime of violence. On September 22, 2010, police received an anonymous 911 call. Four police officers responded, two testified at the hearing. They testified that when they arrived at the house, nothing looked amiss, that it seemed like nobody was home. Both testified that the 911 call was the sole basis for entry and that no contemporaneous observations corroborated the call. For the emergency aid warrant exception to apply, the objective circumstances must lead to a reasonable belief that somebody inside a home needs immediate aid. These objective circumstances must equate probable cause. This Court has described it as substantial evidence in Hill. This means that there needs to be more than simply a possibility that somebody is inside a home needing help. That possibility always exists. And that possibility plus an anonymous tip does not equate to probable cause. Of course, the subjective desire of the police to help is also not relevant. The Second Circuit has specifically addressed this issue of an anonymous call providing the basis for warrantless entry. And it held that, of course, in Kerman, an uncorroborated anonymous 911 call does not provide a reasonable basis for entry. They explained their reasoning by saying that anonymous tips can't even justify a Terry stop, which is, of course, a much less... You gave them a specific address, right? Yes. In both Kerman and in this case, there was a specific address. In this case, you're talking about. In fact, there was a specific address. There was a specific address. Is that apartment number? I believe it included the apartment number. Right. When the police arrived, they knocked on that door... And said a woman was being held at gunpoint. That was the content of the call, yes. They knocked loudly on that door. Nobody answered. The other two police... What's the significance of that in the context of the analysis here? The fact that no one answered the door after the police got the telephone call that a woman at this specific apartment is being held at gunpoint. And they get there within, what, three minutes. They knock on the door and they don't get a response. Does that favor you or does that favor the prosecution? That favors us, Your Honor. I expect they'll say it favors them. I'm sure that they will. They certainly make much of the fact that the allegation... They announced police when they knocked on the door. They announced police. Also, two other responding officers who did not testify at the hearing, but their conduct was clear. And for the purpose of the facts here, the district judge said that he credited the officers. Is that right? Yes. Which means that what the officers said are the facts of the case? There's no dispute about what the facts were. No, but the facts are what the officers said. Correct. I mean, they aren't... You don't dispute that. You accept what the officers say here. Absolutely. As being the facts. Absolutely. So the two other police officers... Along with whatever the judge may have found. I don't know what... Right. He did not really make any factual findings with respect to this search. The two other police officers who responded knocked on a neighbor's door, went through the neighbor's and climbed from the roof down the fire escape into the home. There was an open window? Or an unlocked window? It was unlocked. I don't know if it was actually physically open. There was a window that was at least unlocked. Yes. The government mentioned that it would have been dangerous for them to knock and inquire further with neighbors, but that's actually exactly what the government or what the police did here. When we know that there is nothing but an anonymous call, that simply doesn't allow for breaking the sanctity of the home. This court has addressed exigent warrantless entries into residences a couple of times. The most significant, but none of them are... They went in without a warrant. I'm asking some questions here because we've got this group of high school students here. Sure. They normally should have had a warrant to go into a private home, but that Fourth Amendment requires that. And you're saying they should have had a warrant before they did this. They went without a warrant because, according to the government, they had exigent circumstances. Correct. Because someone was, according to the 9-11 call, was being held at gunpoint. That's right. And police don't have to stand around unless someone gets shot. Right. They can take steps to save someone's life. They can if there is a reasonable belief that somebody... My question here is whether, and the judge found there were exigent circumstances and upheld the entry into this apartment. That's correct. In Brooklyn, New York, where it all occurred. Okay, go ahead. So there are two Supreme Court cases that address this. What evidence came into the trial as a result of this search? A firearm that had Mr. Naughton's DNA on it. Highly prejudicial evidence. Anything else? That was the main evidence, the DNA and the firearm. What else was there? From this particular search, that was it. That was it. So a firearm. Yes. But there was all kinds of evidence about firearms. This was the only actual firearm. No, but everybody who testified testified about him waving guns around and holding guns on people. But they just didn't have any other guns. But there was plenty of evidence about guns and him using firearms. Not necessarily shooting people, but having a firearm on him. There was testimony about a firearm. But what the government did in its closing argument was use this specific firearm to corroborate that testimony. So the government was using it in its closing as bolstering the prostitute's testimony. It also referred to it over and over. And, again, it was the only evidence that had DNA on it. The police tested all kinds of stuff. Milton, excuse me. I don't mean to interrupt, but with regard to the photographs of the defendant holding the gun that were in evidence, referring to Joint Appendix 3947, is that the same type of gun? I believe that in at least some of the photographs there was the same type of gun. So they had pictures of him with guns? Yes. And testimony of him in possession of guns? Testimony that he possessed guns and that guns were in the apartment. Okay. No, please, go ahead, Justine. Why isn't this picture of him pointing the gun at somebody at least as prejudicial as having the jury look at a physical weapon that nobody's holding or pointing? Well, the physical gun carries such an emotional impact in front of the jury, far more than a photograph. And that's why the government wants to use it. That's why the government bothered testing it for DNA. The photographs are mostly from social media or promotional materials for Mr. Naughton's rap career. Those are very different contexts from what they used this gun for to bolster the testimony. So the emotional impact of promotional materials versus the gun used, as they were saying this one was used. I'm not sure that's true in a sex trafficking case. This case is about sex and violence. It really wasn't about guns. I don't know how much of an emotional impact, in light of this record, a single gun, even a gun with the defendant's DNA, would have on a jury. Well, what we know is that the government thought it would, because they referred to it over and over and over again. Sometimes the government over-tries their cases. Sometimes. Well, they do. But in a situation where there's a constitutional error, and that means that... But you're saying, right, if you're right, it's a violation of the Fourth Amendment, which is a constitutional error, and we wouldn't have to give you relief on it if it's harmless error beyond a reasonable doubt. And to find harmless error beyond a reasonable doubt, this court would have to... But they found some ammunition too. They had more than a gun with DNA. They had ammunition. They did have ammunition. The ammunition was found in the second warrantless search. But they didn't find any in the first one. They didn't find any. Okay, I'm sorry. There was ammunition in the other search, yeah. But to find harmlessness beyond a reasonable doubt, there would have to be no possibility that this had an impact. Not that it caused the guilty verdict, not that it was the straw that broke the camel's back in the jury's decision-making, but just that it had an impact. And here, a gun with DNA certainly would. You better get on that second search, probably. Yes. You've got a couple other issues here. I have a couple of other issues. On June 2nd, two assistant United States attorneys and two detectives went to Mr. Naughton's apartment to try to investigate. They rang all of the bells outside the vestibule. There was not one that was labeled the superintendent's bell. They rang all the bells, and one person answered the door. It was unreasonable for the prosecutors and the police officers to assume that she had authority to consent to the search. It was unreasonable for them to believe that he and Mr. Naughton had been evicted. There they were told that they'd moved out, and he didn't have any keys. There had been new locks put on the doors, and the landlord told them they could go in. That's essentially what happened. And here the government says, not exigent circumstances involved. We didn't need a warrant because we had consent. And he had abandoned the property. So again, the government says, we didn't need a warrant. The Fourth Amendment's not violated because we had consent. He had left down there somewhere. He's abandoned the place. The government's theory is that the woman's claim that she had sole possessory right of the apartment conferred authority to consent. However, consent is not to be lightly inferred. The question is what the officer reasonably believed. What the officers reasonably believed. Did you say they couldn't reasonably believe that woman? They had no good reasons to believe her. They had never met her before. Before you get to that, let's make sure we appreciate that there's a district judge between us and the officers. So what's our standard of review here on the discrete elements of your claim? Whether there is apparent authority to consent is a mixed question of facts and law that this court reviews de novo. Again, like in the other search, there were very few factual findings made at all anyway. What Judge Motz did say was that even if Mr. Naughton had a right to return to the apartment or retained his property interest, that the police obtained appropriate consent from the landlord. That's essentially his entire ruling. Okay, and so we draw reasonable inferences from that ruling, do we not? The reasonable inference is, well, there's the absolute question of law where there's no deference paid whatsoever, which is whether it was appropriate consent. And the only thing that hints at a factual finding there is that Mr. Naughton retained a right to return. But the landlord didn't testify, right? No, she did not. But the officers did. Two officers testified. And so we have the district judge assessing the landlord's testimony through the landlord's conduct and statements through the prism of the officers. That's correct. And so the district court was a lot closer to what actually happened than obviously we are. Of course. And it is also true that what's going on is not – I mean, I know we have many layers of removal from what's happening here. But we also have the woman who answered the door testifying about statements that Mr. Naughton made. So that is another level of removal. When she claimed that he had left everything and she had changed the locks and so forth, the police officers also testified that the locks looked kind of beat up, that it didn't look new. So that contradicted her statement. She said that she was the manager of the building but did not – Did you call her? No, no. Nobody called her. Nobody called her. So what you're giving us now, again, is through the testimony of the officers. That's through the testimony of the officers. Okay. And she did not have a key. I feel very – I understand it's a mixed question of law and fact and ultimately a question of law. But I wasn't there. I wasn't at the apartment and I wasn't at the suppression hearing. And I've got a district judge making rather summary findings, and I'm just not sure how I'm supposed to second guess, in effect, the district judge. Sure. Judge Davis, again, like the other search, there's really not much dispute about what happened that day. I don't think that the government has a different interpretation of the facts. Judge Moss credited the officers. He did not make any specific credibility findings. One of these things he said, I credit the officers. That's in the transcript. That's in there. Now, whether he said it as to both of them or just one of them, I'm not sure, but he says I credit the officers. I think, Judge King, you're right. I know I'm right. I think he said – I've got it highlighted in my transcript. I think he said he – And he denied the motion. Well, he denied the motion, either way. The fact that she didn't have any reasonable normal access through any public way into the apartment should have at least given these people pause. Climbing up a fire escape and through a window into a furnished bedroom, that's at best sketchy. It would at least make somebody inquire further. And that's what happened. That's what the D.C. Circuit said. But that argument was made to Judge Mott. Well, and this court reviews his conclusion de novo. No, not his factual conclusion. But he didn't make any factual – Well, but the factual conclusions are implicit in his ruling. I got it wrong. He didn't say I credit the officers. He said I absolutely credit the officers. It's on JA-607. Well, crediting the officers, again, we do not dispute what their testimony was. We do not dispute what happened that day. What we dispute is the legal conclusion that came from that, that there was a reasonable basis to believe that she had authority to consent. When you don't have a key, when you don't have an eviction order, when you see before you enter a furnished room, then – But they didn't find much evidence here, either. They found a lot of evidence here. They did? They spent almost a full day's worth of testimony, maybe even more. But they found some scientific stuff. They found a lot of, sort of, logical evidence. They found women's clothing. They found handwritten rap lyrics, which they used throughout the trial. We challenged admissibility of that under 404B. That's not an issue on appeal. I am almost out of time, and I'd really like – And this next question, this next issue, may be the hardest part of the whole case. And you're just getting around to it. I know. I'm sorry. The crime of violence thing. This is – You all tried this before DeCamps came out. We tried it before DeCamps came out. And you submitted a question to the jury about whether it's a crime of violence. And you offered an instruction and said it was a crime of violence. Your Honor – Now you come up here and say it's not. Your Honor, I'd like very much for the court to look at the charge conference relating to that supplemental instruction. It's at JA 3443 and 3891. What happened was the main issue during the jury instruction debate was how the conspiracy element would fit in. So what happened was trial counsel submitted this instruction, and then just as it's opening – You want to take some of your rebuttal time, or what do you want to do? Yes, please, Your Honor. I'd like to be able to address this. Go ahead. And at the actual conference, trial counsel clarified, look, I don't want that bit of the instruction. What I want is the second sentence of the third paragraph or third sentence of the second paragraph, something else, which specifically related to how conspiracy related. So at the charge conference, what happened was Mr. Naughton's counsel identified what it was that he was seeking. So unlike cases where a defendant asks for a ruling and then asks the court of appeals for a separate ruling, that is not what happened here. What happened here was that the government's jury instruction identified that the jury could only convict Mr. Naughton if it found that he had committed a crime of violence and that a crime of violence is one that has an element of force. Stop there. The government concedes that there's no element of force. That alone means that the court can't even get any further. There was simply no possibility that there was evidence that Mr. Naughton had committed a crime of violence because he did not commit anything that had an element of force. If the court were to go further and look at the residual clause, which of course it would have to under plain air, which is not where we are because we made a general motion for a judgment of acquittal, which preserves all arguments that there was insufficient evidence. What if we disagree with you on that? What if we say you are in plain air review? If you disagree with me on that, Your Honor, we still prevail under plain air. And the reason for that is because using the categorical analysis of the indivisible element, there's two main reasons.  In this court, in Garcia, long before this case was even tried, which we cite in our reply brief, says this question has been answered by the court, which referring to Leo Cal held that recklessness like negligence is not enough to support determination that a crime is a crime of violence. Further says we are of opinion that 18 U.S.C. 16B requires that the substantial risk involved be that force will be used as a means to an end in the commission of the crime, not merely that conduct could result in injury. This is a significant difference between 16B, which is what we're looking at here, and the Armed Career Criminal Act, where it's a risk of injury. Where in United States v. Romulus Martin, which is 753 F. 3rd 485, this court decided last year that a reckless mens re is sufficient to establish a crime of violence under the Armed Career, actually I don't remember if that was an Armed Career Criminal Act or a career offender, but under the different more broad otherwise clause, not 16B's residual clause. The other reason, in addition to the recklessness mens re, that means absolutely this simply cannot qualify, is that the indivisible element, government agrees it's an indivisible element, involves the risk of fraud. Under the categorical analysis, this court has to look at the most innocent conduct, and the most innocent conduct that is criminalized by this indivisible element is a reckless use of fraud. Now you're talking about 924 or 1591 or 94, what are you talking about? Which statute are you talking about? I'm talking about 1591. 1591, and you're talking about count 2, which is 924C. Count 2 is 924C, so 924C has its own definition. So we're only talking about the 924C conviction here. We're only talking about the 924C. And it alleges a firearm in furtherance of a crime of violence, and you're saying the crime of violence is not what's in count 1. Exactly, that count 1, which is what they said was the crime of violence, is not the crime of violence. You're saying it's not a crime of violence. Correct. As a matter of law. As a matter of law. And shouldn't have gone to the jury. It shouldn't have even gone to the jury. And certainly under the instructions, as I talked about, where the instructions talk about an element of force, and everyone agrees here that there is no element of force. And that's because that indivisible element is use or reckless disregard of the use. Well, that guy waved a gun around everywhere. I mean, there's plenty of evidence about him waving guns around and intimidating people with firearms. Over and over. Pictures of him. Over and over. Why is that not an element of force? That is not an element of force because the actual conduct, the means that a defendant may have used to commit any particular offense, is not the question. The question that this court has to analyze is looking at the element and whether those elements. We just look at the element, not what happened in this case. Exactly. Any specific conduct is not relevant. And you can commit this crime by fraud. And, in fact, the government argues. Is that where you hang your hat on, the fraud part? Yes. Yes. And, of course, the government agrees that you can commit this crime by fraud. And the government argued to the jury that Mr. Naughton used fraud as one of his means. They said that he had lied to the prostitutes and he told them that he was. This was probably, what, a month before the Camps case? I think that's about right, Your Honor. I just want to highlight again the difference between the residual clause defining crime of violence that applies here and the otherwise clause. Now, where is the residual clause, and which statute you're talking about? The residual clause is in 18 U.S.C. 16B, and specifically 924C has its own residual clause. And is that the one you're talking about? Yes. But the judge instructed on the force clause. The judge instructed on the force clause. So there's two statutes. There's 924C1B3, which is the residual clause. The language of that is identical to 16B. So that's why cases like Leocal from the Supreme Court and Garcia from this court, which describe what's necessary to be a crime of violence under the residual clause, why those are absolutely controlling. It's the identical statutory language. The government relies on the case of United States v. Willoughby. That is not applicable to this case at all. First of all, it's a career offender. I think you've set this up pretty well. Why don't we let them talk about it some, and we'll give you a couple more minutes. Thank you, Your Honor. At the end. We're going to have to get this straightened out somewhere or another. Mr. Roman, good to have you here. Thank you very much, Judge King. May it please the Court. My name is Sujit Raman. I'm the appellate chief for the District of Maryland, appearing on behalf of the United States. Your Honors, if the Court is amenable, I'll just address each of the issues, basically in turn, starting with the Fourth Amendment issues and then moving to what obviously the Court finds very interesting as well, which is the – Do you confess error on either one of those searches?  We certainly do not confess error. You don't confess error on either one of those searches? No. The first one was the exigent search? Yeah, exigent search. And alternative, you claim it's harmless error. That's right. That's absolutely correct. You do claim harmless error. We do. We do. And I do think, obviously, as Judge Floyd observed for this Court in U.S. v. Reed just a few months ago, if you can avoid reaching a constitutional issue, this Court probably should do that under the theory of constitutional avoidance.  You mean we can assume that that was a bad search and say that it's harmless? Correct. That's absolutely correct. And I have to say it's harmless beyond a reasonable doubt for you all to get up there and wave that gun around. Harmless beyond a reasonable doubt. And the reason why it was harmless beyond a reasonable doubt, I think as the Court has pointed out, there was ample testimony in this case. Numerous victim and prostitutes who testified and said, this man threatened me with a gun. He either had it in the back of his pants. He had it in the console of the gun – of the car. But this was a Walther or something. A Walther PPK. That's correct. And there were the other guns referred to as Tech-9. Tech-9. Machine guns. Are they distinguishable? Do people understand the difference? Absolutely. I don't understand the difference. Well, I'll tell you, Your Honor, Tech-9 is a machine gun. It's a massive – It is? It's a monstrosity. It's a military weapon. That's absolutely right. In fact, if you look at page – It's a long gun? Yeah. Tech-9's a long gun. Yeah. Tech-10? Tech-10, I'm not sure the difference. Do you know if it's a long gun? I think it is. I'm not sure. I don't know. Is this the only pistol? Correct. It's the only handgun. The only handgun. So the other two guns referred to here are long guns. You can't mistake them. I mean, Your Honor, if you look at page 1552 of the Joint Appendix – I'll take that explanation. I understand they're between long ones and little ones. Now, there was a gun magazine also seized in that search, was there not? That's correct. In the first search, that's right. Right, in the September search. Did the government make any reference to that in its closing argument? Not much reference, Your Honor. I do believe the prosecutor held up the gun. I don't know if he held up the actual magazine or not. I think he did hold up the gun. Although, if you look at the opening closing argument, there's almost no reference made to the actual gun. I think he held it up at one point, but he doesn't ever really talk about it. Well, they both say he waved it around. Well, you know, in a closing argument – I can scare people to somebody holding it. In a closing argument that spans probably a couple hundred pages in this case, the references made to the actual, you know, material, EL, seized from the apartment in September of 2010, was minuscule. How often did you show the gun to the jury during the trial? You know, Your Honor, I believe it was present in the opening statement in the same way that the defense lawyer had a poster of Mr. Naughton. No, no, if you'd restrict yourself to answering the question, how often did the government show the gun to the jury during the trial? I'm not sure of that, Your Honor. I did not try the case. My understanding is certainly we, I think, did make reference to it in an opening statement in terms of sort of it being on the counsel table. I do not know whether it was present during the actual trial. Was it on the counsel table or on the clerk's table? I don't think the record reflects that. All during the trial? I don't think the record reflects that, Your Honor, so I don't know. But I will say that, you know, there was multiple testimony in this case referring not only to the Walter PPK, which renders any error harmless, because even if you don't have the actual gun in evidence, if other witnesses are talking about it and if photographs depict that very same gun, it's harmless. But more than that, the reference to the TEC-9, which is a much more intimidating, a monstrosity. I keep mentioning, page 1552 of the joint… Did the jury know that it's a monstrosity? They do because NBF, victim NBF said, the gun on both of my rights is the gun that stuck out of my head and has been stuck in my brain since I saw it because it's a monstrosity of a gun. Did the jury ever see a picture of that gun? The TEC-9? Yes, Your Honor, because it's one of the… What's the appendix site for that? I don't have it, Your Honor, but actually when Your Honor held up the pictures from I think it's Facebook or MySpace, you'll see both Mr. Naughton and Mr. Connors, I believe, holding these massive, huge, you know, magazines. I think that's the reference to the TEC-9. But certainly there's documentary… I mean, there's certainly testimonial evidence relating to that. Let's get back to the search. What I'm concerned about, if we don't conclude that this is… if we don't take the harmless error approach, how do we go about articulating what standard needs to be met? We have the Hill case that says there has to be substantial evidence of imminent danger. Are you advocating that we apply that test exactly as stated in Hill and conclude that an anonymous tip without more is substantial evidence of imminent danger? I think substantial evidence in the eyes of an objective police officer. So, yes, you need to apply Hill, of course. You need to apply Hunsberger as well, and you need to apply Brigham City. Now, if you look at all three of those cases together, the test is an objective one, not a subjective test of what's in the officer's mind. Right, but how can an anonymous tip without anything more ever be substantial evidence of an exigent circumstance? It's not anything more, Your Honor, for a couple of reasons. In this case, I think as Judge King observed earlier, the cops were there in three minutes. So these are officers who know that precinct. They're in that sector. They know the neighborhood. They know that there have been violent shootings in that neighborhood in the past, which is not insignificant. It's not a factor that the court can rely upon just as a single factor. But when you take into account police officers who are acting responsibly, and that is the lodestar of the analysis. You know, I think about Chief Justice Roberts' opinion in Brigham City where he said— Well, but wait a minute. You're saying they're acting responsibly. That's a characterization. We have to find that there is substantial evidence. And what is the evidence other than the tip? The evidence is the tip, the fact that it's a very dangerous neighborhood where that would not be relevant if somebody was choking, for instance. So a person has more rights if they live in a rich neighborhood… Absolutely not, Your Honor. …than if they live in a poor neighborhood. Absolutely not. Isn't that the necessary? Absolutely not. Why not? No, because the point I'm trying to make is if the 911 tip is saying someone's choking, it doesn't matter what the neighborhood is. Right, but if somebody says that somebody's being held at gunpoint… In a precinct. …and if I live in a neighborhood that is characterized as economically depressed, then the police have more of a basis for going in than if I live in Old Town Alexandria in a fancy house? That's not my position, Your Honor. My position is… You have the necessary conclusion to what you're arguing. I don't think it is because… Sounds like that. No, no, I don't think so, Your Honor, because, again, the police officers here are community police officers. This is in the record. Officer Hernandez is a member of that precinct. It's a square mile that he is patrolling every single day. So he knows the neighborhood. He knows that there have been violent incidents in that neighborhood in the past. And so when he gets the call, he's there in three minutes. In fact, he spends more time knocking on the door, four minutes, than he does… Well, I can see your point if there had been very recent evidence of violent conduct. Certainly. But there's nothing in this record that suggests that in the last 24 hours or whatever that there had been violent incidents, is there? I would refer the court to Hunsberger. You know, that's the case where you have the teenagers drinking in the house. And there was evidence in that case that another house had actually burned down, an unoccupied house had burned down, I think, recently in the last month or something. And that was something that the police officers were aware of when they responded to the 911 call in the Hunsberger case. I think it's very analogous to this case. You know, it's got to be a totality of the circumstances, objectively speaking, with relation to the officers. So when Officer Hernandez and I think the other officer, Ortega, who is from the net sector over, so, again, people who are very intimately involved in the community, people who know Marcus Garvey Boulevard, folks who come in and are in a position to, again, they don't just barge right in. They knock. They spend four minutes, more time, as I say, knocking at the door than they did in actually responding to the phone call. Remind us where the gun was, by the way. It was in Plainview on the kitchen counter. So assuming that the officers were in the apartment lawfully under not only the emergency aid exception, which are related yet distinct, and really our strongest argument is emergency aid rather than exigent circumstances. And I don't want to get too far into the doctrine. Judge Rovner has written a very good opinion on this. Emergency aid? Yes, Your Honor, as opposed to exigent circumstances, which are related. Somebody gets a call, then somebody's having a heart attack? Yeah, that's right. Or somebody's about to get shot. In other words, community policing functioning as opposed to a law enforcement function. But if you do that with anonymous tips, I mean, people can call the police about their next-door neighbor. Well, the question, Your Honor, is, is it reasonable? Tell them somebody's in there with a gun. And as I say, you know, this is in the Hunsberger opinion, which, of course, is spying on this court. There's a danger that in the light of day, this is page 556, we can forget that in emergencies the business of policemen and firemen is to not to speculate or meditate on whether the report is correct. Weren't those just general exigency cases? Were they talking about? I think those are emergency aid cases, Your Honor. Excuse me? I think those are emergency aid cases. In other words, when the police officer, who, after all, is a peace officer, whose job is to – You're saying in those cases the police broke down the door of a home? I'm saying that they were entitled to effect a warrantless entry. Entitled to effect a warrantless entry. That's correct. So that is our position. Again, I don't want to – well, I want to make sure I answer the court's questions. You know, you have to look at it from the perspective of an objectively reasonable police person, policeman, whose job, as I say, is to act, whose job is to protect the community, to prevent injury from happening. And so imagine a – But here they had nothing. I guess what I'm worried about is what this means in the larger context. Yes, Your Honor. I mean, you know, how are – what are police officers supposed to take away from this case? How are they going to be instructed? And if you prevail in this case on this issue, it seems to me that anytime they have an anonymous tip, they can break into a house. If the anonymous tip says that somebody is having a gun put to their head, nothing else matters. They can break into a home. Isn't that true? That's really not the logical extension of our position, Your Honor. Why not? Well, there are a couple of reasons why. The first is that there still has to be some objectively reasonable action on the part of a police officer. So if you get an anonymous tip and it's clearly a high schooler playing a prank, it's somebody who's acting like – someone who's obviously a young man and is acting like a 55-year-old or a 95-year-old woman, and he says, I've fallen and I can't get up, you know, to cite the old commercial that we've all seen on TV. Now, I don't think a police officer would objectively reasonably rely upon that obviously prank call 911 phone call. Right. And conversely, if there's something about the call itself that suggests an exigency other than simply saying somebody's being held at gunpoint, if the caller, for example, you know, if there's noise in the background or something that suggests that there is some danger, some violence, if there's gunfire heard or whatever like that, then certainly there can be indicia of reliability. Right. But here we've just got a bald assertion. I respectfully disagree with this, Your Honor. It's something Judge Davis touched on earlier. You've got two layers of deference here. The first is that the police officers testified at the suppression hearing, and Mr. Judge Mott said, and Judge King, you cited this, I absolutely credit the officers. But this is a question of law. Well, respectfully, Your Honor. Whether an anonymous tip with nothing more is sufficient to break into a home. And that's where respectfully I would resist, because I don't think it's just with nothing more. What is the more then? The more is that you have a police officer who knows the neighborhood, is integrated into the community, has dealt with gun shootings in that neighborhood in the past as he testified. You've got him arriving on the – When did he say? Well, I don't have the – he said this neighborhood – excuse me, let me just pull the – This is Officer Hernandez. Page 500 of the Joint Appendix. He said, the neighborhood has a high level of shootings, drug activity, and different types of violence. Okay. So that comes back to the old, you know, if you live in the bad area of Baltimore, they can go into your house. But if you live in the good area, they can't. I don't think it does, Your Honor, because, again, the background has to be taken in context with the actual phone call. If the phone call is completely ludicrous, no reasonable police officer would be entitled to go. In fact, he'd probably be liable under, you know, civil rights statutes. I mean, you can't just barge into a house with absolutely no corroborating evidence. Isn't that what they did here? No, Your Honor, because for the reason – Because there was a high crime neighborhood, you're saying. That's not quite true. That's not true. Respectfully, he responded as soon as he possibly could, spent more time at the door knocking on the door than he did even getting there. So this is not – But the fact there was no answer on the door, at the door, what does that mean? Well, I mean, I think particularly in the context of a potential hostage situation, it makes a lot of sense to say that an officer is reasonably concerned, you know. It makes sense that they don't go around knocking on everyone else's door because that might actually bring neighbors into the line of fire. It might actually give the hostage taker concern that, oh, my gosh, the cops are here. You know, it might escalate the situation. So you have a – the only thing you've got is it's a high crime neighborhood and nobody answered the door. That's your more. And I've got Judge Motz crediting the testimony of the officers, looking at their demeanor. Credited the testimony, but from that testimony, that's what we derive. That's right. Because there was a high crime area and no one answered the door. And officers have to act. And officers have to act. Officers have to act when they're faced with an emergency situation. And, you know, Ms. Skelton said there's a question here of probable cause. Absolutely not. When you're dealing with the emergency aid exception, and this is where I would refer the court to Judge Rovner's opinion in Sutterfield, 751 F. 3rd, 542, decided last year in the Seventh Circuit, really lays out the different distinctions between emergency aid versus exigent circumstances. Exigent circumstances is about evidence collection, Judge Keenan. It is about the fleeing felon running after somebody to make sure they don't flush drugs down the toilet or that they don't get away. So that's law enforcement. This is emergency aid. It's about police officers doing their jobs as officers whose job is to maintain people's safety and the sort of sanctity of their body. It's not about law enforcement. It's not about collecting evidence. And that's a really important distinction between this case and some of the other cases that we've been talking about where officers probably are not justified in, you know, So, again, I don't want to belabor the point. It's obviously a difficult question. And I don't want to stand up here and say that, you know, this is the easiest case that I've ever seen. I mean, as far as the doctrine goes, I will concede that this is about as close as you can get an anonymous 911 phone call without much else because the officers are acting responsibly. They're acting quickly. They're acting expeditiously. There is only three minutes by the time they get to the apartment, and then four minutes when they're knocking on the door, and then they're in. Right? I mean, that is responsible police work. These guys responded immediately. And that's what we want our police officers to do. So, again, one way for the court to avoid this issue, of course, is to look at the harmless beyond a reasonable doubt issue. I think I've discussed that at length. And for the purposes of constitutional avoidance, perhaps it makes sense, Your Honor, to not pick this case as the one to make an example of because we don't have a particularly developed factual record. Your second search, you satisfied with what you have in your brief on that? I'm happy to submit. I want to hear something about this crime of violence. Okay, okay. If you want to say something about your search, you go ahead. I'll take ten seconds, Your Honor. All I'll say is just like the first search, it's an objective analysis. You have to look at what the officers reasonably believed at the time that they were executing the search. You've got a woman there who lives there. She's the superintendent. She's in her pajamas, which actually enhances her credibility because she lives there. She's the one who said, Your Honor. What are you all doing sending the AUSAs up there on searches? I've never heard of such a thing. It's unorthodox, Your Honor, but I'll tell you, it was justified in this case, particularly because of the cross- You mean that you're making witnesses out of the lawyers? Well, possibly. That's a dangerous proposition. It is, and obviously we've talked about the case internally in our office. I would just say that it was a cross-jurisdictional case. You've got Maryland investigators up in New York under time pressure, and frankly, you know, there's a lot to be said for having agents with their legal advisors immediately available. I understand the danger of turning- It's like waiting in the car outside. Well, look- Crawling up the fire escape. That's absolutely right, Your Honor. I mean, I think even Mr. Lensner acknowledged that it was an unorthodox situation, one of the prosecutors. But I want to make sure that I emphasize that there was absolutely- the fact that the lawyers were there or were not there is actually irrelevant to the Fourth Amendment inquiry, right? I appreciate that, Judge Keenan. Let me get right to the sex trafficking issue, Your Honor. First of all, I was reading Carthorne this morning. Footnote 5, an opinion that I know members of this panel are very familiar with, says the government waived waiver. Well, I'll tell you, we haven't waived waiver here. We've asserted waiver. And in our view, Mr. Naughton, in his proposed jury instructions, said and concedes, basically implicitly acknowledges- Now, we're talking about count two, right? Correct. And whether count one is a crime of violence under count two. That's correct. That's all we have here? Yeah, on this issue, yes. And you agree that the statute 1591 is not categorically a crime of violence? I do not concede that. Well, you have to because it has fraud in it. It calls to be committed by fraud. No, Your Honor. And fraud is not violent. Crime of violence has two prongs, right? It does have two prongs. One is the force clause. But the only one you relied on was the force clause. Well, in the district court, but of course- Because it was instructed on the force clause. Well, that's right. But, you know, I don't- That was error. Well, I don't want to lose my waiver argument. So if I could argue waiver first- No, we got your waiver. All right. We got your waiver argument. Let's get to plain error. I want to hear how even under the residual clause you avoid the fraud. Yeah. Well, you know, Your Honor, 1594 is unique because- What's that? 1594, the sex trafficking statutes themselves are unique. And, you know, it's very interesting. Congress, when it enacted the Victim Trafficking Protection Act in 2000- But that one alleges force, fraud, and coercion. Let me get to that, Your Honor. That's right. And we don't know- Fraud is not violent. No, no, no. Well, I disagree with that because of Congress's legislative findings. So this is very unique. In Title 22, Section 7101, Congress made express legislative findings, which this Court owes tremendous deference. Paragraph 7101B9, it's in our brief. Trafficking includes all the elements of the crime of forcible rape when it involves the involuntary participation of another person in sex acts by means of fraud, force, or coercion. So Congress has made a specific factual finding, legislative finding. But tell me this. How can it be involuntary if it's induced by fraud? Well, Your Honor, then- Help me wrap my head around that because the whole notion of fraud is a misrepresentation of fact that induces a voluntary, if misguided or if regretful, unfortunate, lots of ways you can describe that. But surely it's voluntary. So to say that something is both fraudulent and the action it induces is involuntary, I just don't know how you put those two together. I think, Your Honor, I think, Judge Davis, it gets to the idea of consent. Consent? Consent. When we talk about- Fraudulent inducement of consent. That's what fraud is. Which renders it involuntary. If a police officer were to lie to a- That slices it too thin for me. I don't think so, Your Honor. If a police officer were to lie and sort of completely mislead a defendant, I don't think this court would pause for a minute and say any Miranda waiver in that context would be involuntary. It's voluntariness. It's the same concept. It's not knowing, and it's not voluntary. And that's the same idea. I think knowing, intelligent, and voluntary are terms of art largely unique to the Fifth Amendment context. Terms of art that Congress was against which Congress was legislating. Congress was not talking about anybody's Fifth Amendment rights when they were enacting the sex trafficking statute. Well, I think what Congress is talking about is the impact on the subject. That's what Miranda is all about, the impact on the potential criminal defendant. Here, the impact is on the sex trafficking victim. So the element is, we talked about the fear, the sort of zone of fear. That's what that element of the sex trafficking statute is all about. It's by creating this sort of widespread notion of fear in the mind of the victim, you vitiate their consent or their voluntariness. Where is this fear? If the defendant says to the sex trafficking victim, travel from New York to Maryland, engage in prostitution services for two weeks, and I'll get my cousin who lives up in New York to fix your mother's roof. And it's all a lie. Right. Right. And that's it. The victim comes to Maryland, performs prostitution services for two weeks, and goes home. That offense is complete. Yes. It's finished. Yes. It complies with the statute. Right. Right? Right. Sex trafficking through the use of fraud. No doubt. Where's the violence? Where's the threat of violence? You've got to look at 924C3B. And let me just read the statute. That's the residual clause. Yes, that by its nature, the offense by its nature involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. So where's my hypothetical defendant committing, posing any risk of physical injury? When the sex trafficking victim is in the bedroom with the john, Your Honor, there is the, I don't think so. By its nature. Because if it's the john. It could be anybody. It could be other people. So the act of violence, as I understand the statute, is committed by the defendant. No. No. It's the substantial risk that physical force against. So what's your best case that says that? Well, there are a number of cases. In fact, U.S. v. Turner is a case that's not cited in the brief, but it's a First Circuit case that talks about crimes of violence. Yeah, but what's the case that says where the issue is whether the offense is a crime of violence, violence committed by a john, person who hires a prostitute or pays for prostitution services, is sufficient to constitute under the residual clause a crime of violence, which is otherwise perpetrated by fraud. I have not found that case, Your Honor, and that shows why any error was not plain in this case. Well, the reason why you can't find a case is because the statute in subsection B plainly says that may be used in the course of committing the offense. Well, the commission of the offense can only be done by the defendant.  Well, that's what the statute says. No, it doesn't, Your Honor. No, wait a minute. Any person in relation to a crime of violence and in furtherance. . . I'm sorry, where are we, Your Honor? I'm looking at C1A. I have 924, sir. All right, for which the person may be prosecuted in a court of the United States, any person in relation to a crime of violence for which the person may be prosecuted, the person may be prosecuted in a court of the United States, any person. . . Yes. Any person goes to the person. It has to be the defendant. I don't think so. Well, that's what it says. I don't think so. That's what it says, and that's what your indictment says. Your indictment says in relation to a crime of violence for which he may be prosecuted, Jeremy Naughton, a.k.a. Germs Black. No, that's right. He may be prosecuted, for which he may be prosecuted. But he would be convicted and he would be charged and convicted of 924 C. . . A crime of violence for which he may be prosecuted. But we're talking about the nature of . . . That's your indictment in count 2 C. . . No, I don't disagree with that. But, again, you've got to look at the . . . And that indictment is consistent with the statute. That's right. And the statute says under the residual clause of 924 C . . . But you say it could be someone or the other person somewhere else. It would not be him. Well, the question is what is a crime of violence, right? And a crime of violence is any offense that by its nature, and even if it involves fraud, Your Honor . . . A crime of violence for which the person may be prosecuted. And here you're saying it was in relation to a crime of violence for which he may be prosecuted in the court of the United States? That's right. The crime is what he can be prosecuted for. He? He. No, that's right. The defendant. But what is a crime of violence? It's any offense that by its nature involves a substantial risk, a physical force, against the person of another. What if the Supreme Court . . . Let me . . . You've got that read by . . . Maybe used in the course of committing the crime. You stopped reading . . . Maybe used in the course of . . . . . . the part that requires the defendant . . . No, that's right. And so when he's committing the sex trafficking and he puts the woman in the room, you know, she might . . . The actual, you know, physical act itself might expose her to a substantial risk of physical force. Someone might walk in on them. There might be people in the hotel. In fact, I don't want to mix records here. In the Naughton case where you've got the two receptionists who actually come up when, you know, there's a whole hullabaloo in the hotel room, they might have been attacked or victimized. It's the substantial risk of physical force implicit in the nature of the crime. So, you know, in our view, obviously, we do think that 1591A is categorically a crime of violence. In a very interesting . . . in a very important way, we do think this whole argument . . . this whole line of argumentation is waived in this case because the implicit jury instruction that the defendant offered is, we agree. Conspiracy to commit sex trafficking is a crime of violence. Now, this was tied before the DeKalb case. Yes. And they've got a case up there in Supreme Court now that's . . . Johnson. . . . pending decision that may throw out the residual clauses completely under the Fifth Amendment process clause. I don't think so, Your Honor. We don't know what is going to happen, but if you analyze the potential impact of that decision, if it goes the wrong way. Right. You know, there are a couple of different ways, but frankly, respectfully, you know, if the Supreme Court strikes down the ACCA residual clause . . . That's right. We would ask for an opportunity to brief the issue because it's actually quite important. 924C's residual clause is very different. Right. It's going to . . . if they rule the way a lot of commentators think they're going to rule . . . Yes. It's going to have an impact on this case. It will not have an impact on this case. It's going to have. It will not. It will not have an impact. It will not have an impact. Because they are distinguishable. In fact, Leo Cal . . . Leo Cal, I think it's footnote 7, makes a difference, draws a distinction between the 16B residual clause and the ACCA residual clause. And again, in fact, Mr. Johnson . . . But 16B or B is not what you tried the case under. You tried under A. No, no, no. 16B . . . The A clause, the force clause is what was instructed here, wasn't it? Not B. Well, that's what was instructed, but again, we've . . . Yeah, but the court is well aware . . . I'm happy to concede error on that, but we don't think it was plain. Well, I don't think it was plain because, of course, how could it be plain error? Well, for plain, there's two different things. There's error and then it's whether it's plain. Fair enough. I mean, it might not . . . Happy to concede error. It might not be plain. Well, I don't think it's plain because . . . You tried the case under one prong, and now you say it's under another prong. Well, it's his burden. It's his burden. It's his burden to show that there was an error here. I mean, he never raised this issue in the district court. They can't stipulate to the law anyway. I mean . . . Well, that's right. But they can object. Just like Mr. . . . . . . might not take a position . . . Just like Mr. . . . . . . in which we have to review it for a plain error. That's right. But they can't stipulate to the law, and neither can you. Well, that's right. We've got to figure that out. Just like Mr. DeCamp took his case all the way to the Supreme Court, the lawyers in this case could have lodged an objection. They could have said, you know what, this is a divisible statute, and they didn't do it. And now on appeal for the first time in their opening appellate brief, we hear an allegation of error. So let's assume an error, there was no plain error, and there certainly was no effect on substantial rights. Because, again, in our view, and the court might disagree with this, under the residual clause, it is categorically a crime of violence. I've gone way over time, but I'm happy to answer any other questions. We're going to have to give Ms. Kelton a chance to respond to all this, too. Thank you, Ron. Thank you very much. You're in the next case, and we're glad to see that here. Thank you. You weren't on the briefs, I don't think. I was wondering who was going to show up here. Ms. Kelton. Thank you, Your Honor. Judge King, I just want to say, when you mentioned that if Johnson goes the wrong way, it might have an impact, I'd suggest if it goes the right way. Well, the wrong way for the lawyer that was arguing. It might go the right way for you. Right way for me. And if it goes the right way for you, you're going to say it has some impact on this. I will. Right. But we don't know. And he's exactly right. Depending on how it goes, we might have to get some supplemental briefing because it will probably be decided in the next six weeks or so. Right. We'll need to see what they say. There is certainly a way that they could decide that case that would have no impact. You know, it just is going to depend on how they phrase it. Sort of as applied to the sawed-off shotguns kind of thing? Perhaps they might try to dodge the issue that way. It's absolutely possible. Could you tell us, as succinctly as you can, why there's no forfeiture here, why there's no waiver? There are two reasons. First is because we made a general motion for a judgment of acquittal, which is, it's well accepted. Okay, okay. You're right. Under federal law, a general motion is sufficient to preserve any claim of evidentiary insufficiency. But do we have here a claim of evidentiary insufficiency, or do we have what is closer to a pure error of law in the instructions given by the court? We do actually have an evidentiary insufficiency. Why is that? Because the jury had to decide if he had committed an offense that had an element of force. So that was something that the jury was told. That's a legal question. Jurors don't decide law. Well, that still is what they went back to the jury room and were told to decide. I know, that's right. It was sent to the jury, but courts decide questions of the law. Well, and in that case, this court should look at it de novo. And, in fact, here there was force. There's no question here there was evidence of force. There was also fraud. Yeah, but the jury wasn't asked, nor would it have been appropriate to have the jury decide whether it was fraud or force. Well, the question is not- But those that were in the jury, they're going to say there was force, because there absolutely was. They had a gun at their head. And that's where- So you lose on that. We don't, Judge King, because that's where the categorical analysis comes in. It is not the conduct. It is the indivisible element. Okay, what's your second reason why you say- No waiver. No waiver. And that's because of the jury instruction conference at J3443 that I had mentioned before, where we specifically explained what we were looking for in those instructions, and it had nothing to do with crime of violence. So summarize that again for us, what you were looking for. Yes. So trial counsel said, look, when it comes down to it, Your Honor, with respect to the 924C count, I had also submitted a special requested instruction. I reexamined what I submitted to the court, and really, in essence, if you boil it down, really what I want is what's important is one sentence from my paragraph or paragraph 3 in the special instruction. And when you line up what you're talking about- Oh, wait. I mean, is that it? Is that all you're going to read? Because I'm listening for what counsel asked for. I don't have that readily at hand, but in his proposed instruction, the sentence that he's referring to is whether the conspiracy was in play, whether the 924C, the use in furtherance of the crime of violence, was related to the conspiracy at all. I thought you all offered an instruction that defined crime of violence consistent with A. Yes. And told the jury they had to consider that. That was the pattern jury instruction. Well, I know, but you all offered it, and so did they. And it was the government that this is what- Now you're up here arguing something else. So truly, Judge King, if the court is inclined to look at it under plain error, I think that that's not a problem for Mr. Naughton. Maybe the best you can do is get us to look on it under plain error. Well, sure. And, again, I don't retreat from our path to victory, if you will, under- So essentially you're saying counsel attempted at the charge conference to tweak the previously submitted charge. Right. And that happens all the time. You first might submit a written motion. I understand that, but okay. And what did the judge say? The judge said, okay, well, we'll just give it to the jury and let them figure it out. The judge's ruling on it is not very clear.  And there certainly was no objection after the charge. Correct. Okay. So why would it be plain error? It would be plain error because, as Judge King and you were talking about, it has to be the offender under the statute. The only person relevant is the offender. The fact that it could be a John who committed violence or had a threat of use of force, because it's not actually violence. It's whether there's a risk of force. Whether it's someone else, whether the prostitute may be injured, that is not the question. That is the Armed Career Criminal Act. What we have here, and in the Armed Career Criminal Act, it could be just a risk of injury. It could be anything else. It could be. So the district judge and both sets of counsel got it wrong. It's a matter of law. Just got it wrong. They got it wrong. It's as if the judge had instructed in Swahili. Perhaps so. It's not just that it be the offender that's necessary, but it's also the intentional use of force as a means to an end. And that's where this court has said that phrase, use of force as a means to an end, does not equate to recklessness. And this offense involves recklessness. The indivisible statute has that state of mind. That state of mind is alone enough to disqualify it as a crime of violence. If the court would indulge me, I want to say one thing on the 911 call, which is Mr. Rahman said that it's not a question of probable cause. I respectfully disagree. In the case that the government cited in its brief, which is a Fourth Circuit case, United States versus Campbell, this court said that that kind of warrantless entry requires the equivalent of probable cause. And in Hill, this court kind of dodged the issue and said there's substantial evidence, there's probable cause. We're not going to actually say which one is going on. Of course, that's an arrest case. It's a little bit different. All right, that's a crime-fighting case. The government says this is not a crime-fighting case. That's right. In the Supreme Court cases, Brigham City that they referred to and Fisher, both of them basically describe probable cause. When the police arrive, they get a 911 call. When they arrive, they hear a fight. They see juveniles drinking. They see someone throw a punch and get a bloody nose. That's Brigham City. That's all a lot of corroboration that there's something going on and somebody inside needs help. In Fisher, they saw a smashed-up truck, broken glass on the ground, showing that it had been recent, blood, and somebody inside screaming crazy. So are you saying they should have just walked away? They knock on the door, they knock on the door, they knock on the door. They hear nothing. Oh, it was a false report, and they leave? Well, that's what the police did. That's a dangerous decision. That's what the police did in Hunsberger. Well, I don't know about the case, but the point he makes on that about rendering aid has some appeal to me. I don't want anybody getting shot, and I don't think you do either. Absolutely. But Hunsberger does provide a clear comparison. The police arrived after the 911 call, knocked on the door, no answer. They didn't see anything amiss, and they left. And then their neighbor called 911 again. They went back. They talked to her. They investigated more. They called the registered owners of cars. They got a report that there was a missing minor whose car was there, but she wasn't supposed to be, and there's a lot of other investigations. But the 911 wasn't just a gun to the head of a person being held. In Kerman, the 911 call where the Second Circuit said that that was insufficient, the substance of that call was that there is somebody who is mentally ill, off his medicine, has a gun, and is suicidal. You don't really mean to suggest we should follow the Second Circuit because this all happened in Harlem, do you? No. Well, I'm suggesting that you follow the Second Circuit because otherwise you would be knowingly creating a circuit split, and you're certainly free to do that. I'm sure we'd create a circuit split even if we dealt with the merits of the Fourth Amendment question here. I'm not sure how the court could avoid it when the Second Circuit's ruling is so explicit that an anonymous call alone is insufficient. But that's not this case. You can disagree about how much more there was, but this is not a case dealing solely with an anonymous call. It's not like they showed up and barged in as soon as they reached the landing. Mr. Rahman's more is the neighborhood and the neighborhood. Well, no. You know, they're knocking four minutes. Respectfully, Judge Davis, I don't think that the speed with which they respond leads to one way or the other in objectiveness. I would assume that people would respond quickly to a 911 call. Okay. I mean, that's a fair argument, but it strikes me as impressive that they got there in three minutes and they actually waited for as long as they did before continuing their investigation. If they got there that fast, then there's absolutely no sign, no indication that anyone's home. The police officers testified it seems like no one's home. That's the problem. How do you know if anybody's home when there's no answer? Well, the other kind of— If somebody's holding the gun on somebody in there and they hear police, you know, there's reason to think that there's not going to be a response. Well, as a contrast is when the police had a warrantless entry into Mr. Naughton's hotel room up in Rockville where there was a call from the hotel that there's something hanky going on upstairs, and they go up and they hear punching, they hear something else, and then they go in. And, I mean, I would love to have been able to challenge that search on appeal, but I didn't think I could because it sounded like there were circumstances justifying that entry. Thank you, Your Honor. Thank you very much, Ms. Kelton. Before we come down to Greek Council, I want to— Go ahead and take your seat. I want to just say a couple more things about the high school students. I want to really say that we really appreciate having you all here. The U.S. government class at West Point High School, 57 of you, three chaperones, Mr. Redden, I think, the teacher, we really appreciate it. I'm a former— Mr. Redden's over there. I'm a former government high school teacher, Mr. Redden, myself, before I went to law school. And I want to say that the fact that we've asked a lot of questions, been very active with the lawyers. Judge Keenan, as a matter of fact, is from Virginia. Judge Davis, Maryland. I'm from West Virginia, all part of the five states in the Fourth Circuit. We've asked a lot of questions of these lawyers who are very, very, very capable in both these cases. They're very difficult cases. And all we're trying to do is draw out the lawyers. We really appreciate what they do. They're the smartest people around, know more about this case than anybody. And I don't want you to draw the fact that we may have been asking sharp questions in some instances, but we're not being critical of anything that they do in any way. But we really appreciate you all being here, and it's a great opportunity for you. And I want to take this opportunity rather than at the end of the third case which we're going to get to just in a minute. Judge Keenan, do you have anything you want to add to the students? No, thank you, Judge. We'll come down and greet counsel, and then we're going to take a short break and reconfigure the courtroom a little bit.
judges: Robert B. King, Barbara Milano Keenan, Andre M. Davis